**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 13, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re:

Millennium Multiple Employer Welfare
Benefit Plan,

    Debtor.

---

AVIVA LIFE AND ANNUITY
COMPANY, fka Indianapolis Life
Insurance Company, an Iowa insurance
corporation,

    Appellant,

v.

JERALD WHITE, M.D.; CLAUDIA
WHITE; DIOGENES HOLDINGS, INC.,

    Appellees.

Nos. 14-6006 and 14-6007

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:13-CV-00957-F and 5:13-CV-00958-F)**

---

J. Michael Vaughan, Walters Bender Strohbehn &Vaughan, P.C., Kansas City, Missouri
(Joseph A. Friedman, Kane Russell Coleman & Logan, P.C., Dallas, Texas, with him on
the briefs) for the Appellant.

Eric D. Madden, Reid Collins & Tsai, LLP, Dallas, Texas (Brandon V. Lewis, Reid Collins & Tsai, LLP, and Kiran A. Phansalkar, Conner & Winters, Oklahoma City, Oklahoma, with him on the briefs) for the Appellee.

---

Before **HOLMES, BACHARACH,** and **McHUGH,** Circuit Judges.

---

**McHUGH**, Circuit Judge.

---

In this consolidated appeal, Aviva Life & Annuity (Aviva) challenges identical orders of the U.S. District Court for the Western District of Oklahoma sitting in its capacity as a bankruptcy appellate court. The district court entered the orders in two directly related cases brought by Aviva in the nature of interpleader pursuant to the Federal Interpleader Act, 28 U.S.C. §§ 1335, 2361, and Federal Rule of Civil Procedure 22.[1] Aviva argues the court erred by limiting the scope of the interpleader relief granted. Exercising jurisdiction pursuant to 28 U.S.C. § 158(d)(1), we affirm.

---

[1] Aviva filed its request for interpleader relief in two separate adversary proceedings, Adv. Nos. 10-1153-WV and 11-1038-WV, before the bankruptcy court. The bankruptcy court considered the adversary proceedings together and entered identical orders in each. Aviva appealed both orders to the district court, which issued identical orders resolving the appeals. Aviva's appeals of the district court's orders have been consolidated before this court.

## I. BACKGROUND

This case arises from the Chapter 11 bankruptcy proceedings of the Millennium Multiple Employer Welfare Benefit Plan (the Millennium Plan).[2] Prior to seeking the protection of the bankruptcy court, the Millennium Plan was an employee welfare benefit plan providing medical, disability, long term care, severance, and death benefits. Participants made contributions to the Millennium Plan, which then purchased life insurance policies (Policies) on the lives of the participants from Aviva and other insurance companies.

The Millennium Plan used proceeds derived from the Policies to fund its benefit operations. In the event of the death of an insured participant, the Millennium Plan would receive the death benefit due under the policy. It would then pay death benefits to the participant's heirs in accordance with its obligations under a separate agreement between the Millennium Plan and the participant (Participation Agreement). The Millennium Plan was obligated to pay the premiums on the Policies, regardless of whether participants paid their contributions under the Participation Agreements. Conversely, the Participation Agreements required the Millennium Plan to provide covered benefits, even if Aviva denied coverage under the Policies.

---

[2] We recite the facts based on the findings of the bankruptcy court because neither party has challenged them on appeal. *Green v. Johnson*, 977 F.2d 1383, 1385 n.2 (10th Cir. 1992).

The Millennium Plan held the Policies for the collective benefit of all participants. It used the benefits paid under the Policies, along with the proceeds of loans taken against the cash surrender value of the Policies, as the primary source of funds for its various benefit operations. Thus, the participants were neither the legal owners nor the beneficiaries of the Policies. Instead, the Policies were owned by the Millennium Plan and benefits paid under the Policies, as well as the proceeds of loans secured by the Policies, were pooled for the collective benefit of all participants. In turn, the participants were entitled to only the benefits provided under the Participation Agreements.

Several groups of participants and employers in multiple states brought lawsuits against the Millennium Plan, Aviva, and other insurance companies under a variety of legal theories. The claims asserted in these lawsuits were based on allegations that the defendants fraudulently induced the participants to enter into the Participation Agreements. Of importance to this appeal, Jerald White, Claudia White, and Diogenes Holdings, Inc. (collectively, the Whites) brought suit in Tennessee state court against the Millennium Plan, Aviva, and other insurance providers for fraud, negligent misrepresentation, civil conspiracy, violations of the Tennessee Insurance Code, violations of the Tennessee Consumer Protection Act, accounting malpractice, breach of fiduciary duty, unjust enrichment, and constructive and resulting trust (the White

Litigation).[3] The Whites alleged agents of Aviva fraudulently induced them to enter into the Participation Agreements with the Millennium Plan by representing the Participation Agreements complied with section 419A(f)(6) of the Internal Revenue Code. Specifically, the Whites claimed Aviva's agents told them they could invest tax-deductible amounts in the Millennium Plan and later withdraw their investment tax-free. As the result of a 2005 Internal Revenue Service (IRS) audit, the Whites discovered the Participation Agreements did not comply with IRS regulations. The IRS served the Whites with a Notice of Deficiency, seeking more than $760,000 in taxes and penalties based on their participation in the Millennium Plan. The White Litigation seeks compensatory and punitive damages from Aviva, the Millennium Plan, and other insurers.

Faced with the participant law suits, the Millennium Plan filed a Chapter 11 petition with the bankruptcy court and removed the White Litigation to federal court. As part of the bankruptcy proceedings, the Millennium Plan's bankruptcy trustee sued Aviva, alleging the Policies were property of the bankruptcy estate and Aviva should be ordered to tender the cash value of the Policies to the bankruptcy court. *See* 11 U.S.C. § 542 (requiring an entity in possession of property belonging to a debtor in bankruptcy to deliver such property to the bankruptcy trustee). By doing so, the Millennium Plan exercised ownership over the Policies.

---

[3] All other participants have now settled with Aviva or have defaulted in the interpleader actions. Accordingly, only the Whites are parties to this appeal.

In response, Aviva sought interpleader relief before the bankruptcy court and the U.S. District Court for the Western District of Oklahoma. According to Aviva, it would be subject to duplicative liability if forced to surrender the cash value of the Policies to the Millennium Plan's bankruptcy trustee, while simultaneously facing claims of ownership over the Policies from the participants. Aviva therefore sought an order "requiring the [participants] . . . to interplead any and all claims or potential claims they have asserted or may assert against [the] Policies and against Aviva relating to its obligations under [the] Policies." Additionally, Aviva sought "injunctive relief enjoining the [participants] from initiating or prosecuting any claims or proceedings against Aviva in any other Court affecting or which may affect those obligations, in order to protect Aviva from further exposure to potential dual liability and multiple, vexatious litigation."

Ultimately, the bankruptcy court entered an order granting Aviva leave to deposit into the court registry the amount of $6,822,331.44, which was the net cash surrender value of the Policies owned by the Millennium Plan, including the Policies insuring the Whites. This effectively settled the Millennium Plan's claims of ownership over the Policies.

With respect to the participants' claims against the Millennium Plan, the bankruptcy trustee distributed the assets of the bankruptcy estate, including the $6,822,331.44 cash value of the Policies, in accordance with the approved liquidation plan. Under the plan, the Whites received a distribution in full satisfaction of their claims against the Millennium Plan and its trustee. The Whites then moved to amend their

complaint in the White Litigation to dismiss with prejudice the claims against the Millennium Plan and its trustee which had been resolved in the bankruptcy proceeding. In addition, the Whites dismissed their claims for constructive trust, unjust enrichment, and injunctive relief against Aviva. Importantly, the Whites' First Amended Complaint declares, "Plaintiffs . . . do not seek to recover the life insurance policies from [Aviva]. Nor do Plaintiffs seek to rescind those insurance policies. Indeed, Plaintiffs expressly acknowledge that legal and beneficial ownership of the . . . policies rests with the Millennium Plan." But the Whites continued to pursue tort claims against Aviva for common law fraud, negligent misrepresentation, civil conspiracy, insurance fraud under Tennessee law, violations of the Tennessee Consumer Protection Act of 1977, and breach of fiduciary duty.

In response, Aviva petitioned the bankruptcy court for a permanent injunction pursuant to 28 U.S.C. § 2361, enjoining the Whites and other participants from prosecuting any claims against Aviva that would expose it to dual liability with respect to its obligations under the Policies. Aviva argued the Whites' state law tort claims, if successful, would compel Aviva to disgorge the equivalent of the premiums it had received for the Policies, even though Aviva had already paid the cash value of the Policies to the Millennium Plan's bankruptcy estate.

The bankruptcy court granted Aviva's petition, in part. It found that interpleader jurisdiction was appropriate and granted Aviva's request for an injunction with respect to any claims of legal or equitable ownership over the Policies. But the bankruptcy court

denied injunctive relief for any claims for damages in tort flowing from the participants' reliance on Aviva's misrepresentations regarding the Millennium Plan because those claims were beyond the scope of the court's interpleader jurisdiction. Finally, the bankruptcy court dismissed Aviva's interpleader complaint with respect to the White Litigation because the Whites had voluntarily dismissed with prejudice all claims of ownership over the Policies.

Aviva appealed the bankruptcy court's decision to the U.S. District Court for the Western District of Oklahoma, arguing the bankruptcy court erred by limiting the scope of its injunction. The district court agreed with the bankruptcy court's analysis and result. For the reasons discussed below, we affirm.

## II. DISCUSSION

In an appeal from a final decision of a bankruptcy court, "we independently review the bankruptcy court's decision, applying the same standard as the [bankruptcy appellate panel] or district court." *In re Baldwin*, 593 F.3d 1155, 1159 (10th Cir. 2010). In doing so, we treat the bankruptcy appellate panel or district court as a "subordinate appellate tribunal whose rulings are not entitled to any deference (although they may certainly be persuasive)." *In re Miller*, 666 F.3d 1255, 1260 (10th Cir. 2012). A

bankruptcy court's legal conclusions are reviewed de novo, while its factual findings are

reviewed for clear error. [4] *Id.*

On appeal, Aviva does not dispute the bankruptcy court's conclusion that

interpleader jurisdiction was proper. Nor does it dispute the bankruptcy court's grant of

an injunction protecting Aviva from any claims of legal or equitable ownership over the

Policies. Instead, Aviva's challenge on appeal is limited to whether the bankruptcy court

misconstrued our precedent as established in *Holcomb v. Aetna Life Insurance Co.*, 228

F.2d 75 (10th Cir. 1955) (*Holcomb I*) and *Holcomb v. Aetna Life Insurance Co.*, 255 F.2d

577 (10th Cir. 1958) (*Holcomb II*), when it limited the scope of its injunction. Before

addressing Aviva's specific claims on appeal, we briefly discuss the purpose and nature

of the interpleader remedy. We then review our decisions in *Holcomb I* and *II*, before

moving to our analysis of Aviva's particular arguments.

### A. Controlling Law

Interpleader is a statutory remedy that offers "a party who fears being exposed to

the vexation of defending multiple claims to a limited fund or property that is under his

control a procedure to settle the controversy and satisfy his obligation in a single

proceeding." 7 Charles Allen Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 1704 (3d ed. 2001). The interpleader statute provides that a party may bring

---

[4] The parties dispute the proper standard of review. The Whites argue that we review the bankruptcy court's grant or denial of interpleader relief for abuse of discretion. Because we would affirm under the less-deferential de novo standard advocated by Aviva, we need not address this argument.

an interpleader action if the party has in its possession property valued at $500 or more to which "[t]wo or more adverse claimants, of diverse citizenship . . . are claiming or may claim" ownership. 28 U.S.C. § 1335. The statute requires the interpleader plaintiff to deposit the disputed property into the registry of the court or post a bond with the court. *Id.* The claims to the asset need "not have a common origin" nor be identical. *Id.* Instead, the statute requires that the claims to the disputed fund be "adverse to and independent of one another." *Id.* Thus, the key statutory requirements of interpleader jurisdiction are: (1) an identifiable stake, or res, valued at $500 or more[5]; (2) against which adverse claims are brought.

If those requirements are met, interpleader jurisdiction is proper and federal courts are empowered to enjoin claimants from "instituting or prosecuting any proceeding in any State or United States court affecting the property . . . involved in the interpleader action." 28 U.S.C. § 2361. The court may then discharge the interpleader plaintiff of any further liability and make the injunction permanent, thereby allowing the interpleader plaintiff to withdraw and leaving the interpleader defendants to prosecute their competing claims to the disputed property among themselves. *See id.* Thus, interpleader suits are focused on adverse claims to a single, identifiable stake, or res, that is under the control of the interpleader plaintiff and can be delivered to the registry of the court. *See State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530 (1967) (recognizing that the

---

[5] There is no dispute that the value of the Policies exceeds $500 and we do not discuss this requirement of the Interpleader statute further.

legislative purpose of interpleader is "to remedy the problems posed by multiple claimants to a single fund"). The court's power to grant an injunction under the Interpleader statute is limited to enjoining adverse claims to the identified stake. *Id.* at 533–36 ("In this situation, the fund itself is the target of the claimants. It marks the outer limits of the controversy.").

Importantly, the interpleader remedy is not designed to consolidate all claims arising out of a single transaction or occurrence into one action. To the contrary, the Supreme Court has expressly rejected the notion that interpleader functions as "an all-purpose bill of peace." *Id.* at 534–36 (internal quotation marks omitted). In *Tashire*, a Greyhound bus collided with a pickup truck in California. *Id.* at 525. Four passengers injured in the collision brought suit against Greyhound, the bus driver, the truck driver, and the owner of the truck. *Id.* The truck driver was insured by State Farm under a policy with injury liability up to $10,000 per person and $20,000 per incident. *Id.* at 526. State Farm brought an interpleader action against the passengers, Greyhound, the bus driver, and the truck owner, arguing the aggregate damages far exceeded the $20,000 policy limit. *Id.* It sought an injunction requiring all parties to bring their claims against the truck driver in a single proceeding. *Id.* Greyhound moved to broaden the injunction to require that all claims related to the accident be prosecuted in the interpleader proceeding. *Id.* at 527. The district court granted Greyhound's requested injunction. *Id.* at 527–28. On appeal, the Supreme Court reversed. The Court upheld the original scope of the injunction because "State Farm's interest in [the] case, which [was] the fulcrum of the

-11-

interpleader procedure, [was] confined to its $20,000 fund." *Id.* at 535. But it concluded

the district court exceeded the powers granted by the interpleader statute when it also

attempted to control claims against Greyhound. *Id.* The Court admonished against

attempting to use the interpleader remedy "to solve all the vexing problems of multiparty

litigation." *Id.* at 535. And it instructed that, outside of adverse claims to the identifiable

asset, plaintiffs are allowed to resolve their claims in the forum of their choice, subject to

normal jurisdiction and venue rules. *Id.* at 536.

The decisions of this circuit have similarly affirmed interpleader's focus on

adverse claims to an identifiable asset. For example, in *General Atomic Power Co. v.*

*Duke Power Co.*, we emphasized that the "mission of [the interpleader] statute is to

administer a limited amount of property and conflicting claims . . . to that property." 553

F.2d 53, 57 (10th Cir. 1977). Similarly, in *Knoll v. Socony Mobil Oil Co.*, we reversed the

district court's injunction enjoining further claims against the interpleader plaintiff

outside of the interpleader action, stating, "In an interpleader action, . . . jurisdiction

extends only to the fund deposited with the court." 369 F.2d 425, 429 (10th Cir. 1966),

*overruled on other grounds by Liberty Nat'l Bank & Trust Co. of Okla. v. Acme Tool Div.*

*of the Rucker Co.*, 540 F.2d 1375 (10th Cir. 1976); *see also N. Nat. Gas Co. v. Grounds*,

292 F. Supp. 619, 640 (D. Kan. 1968), *aff'd in part*, *rev'd in part on other grounds*, 441

F.2d 704 (10th Cir. 1971) ("In interpleader actions, . . . the subject matter of the action is

not a set of facts, a transaction or occurrence which gives rise to the litigation, but *a*

-12-

*specific identified fund or property*. Claims must not only relate to that property, but *be asserted against it . . . .*" (internal quotation marks omitted) (emphasis added)).

Despite Aviva's urging, we do not read our decisions in *Holcomb I* and *II* as holding to the contrary. In *Holcomb I*, Aetna Life Insurance Company (Aetna) brought an action in interpleader identifying the res as an annuity insurance policy purchased by Rosa Rettenmeyer. *Holcomb I*, 228 F.2d at 77–78. Following Ms. Rettenmeyer's death, a group of individuals (the Conversion Claimants) intervened in the ensuing probate proceedings and challenged the validity of the annuity. *Id.* at 78. The Conversion Claimants had filed state court actions, alleging Aetna had wrongfully converted government bonds owned by Ms. Rettenmeyer, and seeking the return of the bond proceeds for the benefit of Ms. Rettenmeyer's estate. *Id.* However, Ms. Rettenmeyer had used the proceeds from the bonds to pay the premium on the annuity policy. *Id.* Aetna's interpleader complaint identified a second group of individuals (the Annuity Claimants) who, as beneficiaries of the annuity policy, were asserting or might assert a right to receive monthly payments under that policy. *Id.* In effect, the Conversion Claimants sought the return of the premium paid to Aetna to purchase the annuity policy, while the Annuity Claimants wanted the annuity contract honored and the benefits under it paid. Aetna sought interpleader relief on the ground it would be subject to multiple liabilities on the same obligation in the event both the Conversion Claimants and the Annuity Claimants prevailed on their claims. *Id.* The district court exercised interpleader

jurisdiction and enjoined the state conversion proceedings and any other potential actions relating to the annuity contract. *Id.* at 78–79.

The Conversion Claimants appealed, arguing the district court exceeded its interpleader jurisdiction by enjoining the conversion actions for two reasons. First, they argued there could be "no identity of property, instrument, or obligation" where the state conversion actions made no reference to the annuity contract or the premium paid for it. *Id.* at 80. That is, the Conversion Claimants argued their conversion action did not target the interpleaded asset—the annuity. Second, the Conversion Claimants argued the "outcome of the cases in the state courts and the obligation of Aetna under the contract of insurance [were] wholly unrelated matters"—i.e., the conversion action and any claim for benefits under the annuity were not adverse. *Id.* We disagreed. Focusing on the substance of the claims, this court explained, "If Aetna is under only a single liability, the claim asserted against it in the state courts and the claim of the annuitants for payment or continued payment of specified sums under the terms of the contract of insurance necessarily in contemplation of law negate each other and are adverse each to the other." *Id.* at 81. In effect, this court held that the competing claims were necessarily adverse and mutually exclusive claims to the same asset. Accordingly, we affirmed the district court's exercise of interpleader jurisdiction and its order enjoining the state conversion actions.

*Holcomb II* is a companion case to *Holcomb I* in which Aetna asserted the same basis for interpleader with respect to an endowment contract also purchased with the proceeds of the government bonds alleged to have been wrongfully converted. *Holcomb*

*II,* 255 F.2d at 579. At the pre-trial conference in the district court, the Conversion Claimants expressly disavowed any claim relative to Aetna's obligations to the beneficiaries under the endowment contract and argued this concession eliminated any conflict between their conversion action and claims for benefits under the endowment policy. *See id.* at 577. Nevertheless, the district court granted interpleader relief and enjoined the conversion action and any claims arising under the endowment contract. *Id.* Again focusing on the substance of the legal claims, this court upheld the district court's conclusion that the conversion action was an attack on the validity of the endowment contract, explaining that if "the consideration [for the endowment contract] was wrongfully obtained, there was no meeting of the minds, [and] the contract fails." *Id.* at 582. Despite the Conversion Claimants' attempt to artfully plead their claim to disavow an interest in the endowment policy, and thus avoid interpleader, our focus remained on the substance of the legal claims and whether those claims were necessarily adverse and mutually exclusive.

Thus, our decisions in *Holcomb I* and *II* are consistent with the fundamental principles we have previously identified as framing the interpleader analysis. In an action in interpleader, the court must first determine whether a single, identifiable stake is present. The court must then determine whether there are two or more adverse claims to that stake, focusing on the substance of the legal claims asserted. If these two elements are present, then interpleader jurisdiction is proper and the stake constitutes the outer limits of that jurisdiction. The court may enjoin all other suits claiming an interest in the

-15-

stake, but lacks jurisdiction to enjoin other claims between the claimants and the

stakeholder, even if they arise from the same transaction or occurrence.

### B. *Application of the Law to Aviva's Claims on Appeal*

As discussed, the bankruptcy court granted Aviva an injunction barring the

participants from asserting legal or equitable ownership interests in the Policies, but

denied injunctive relief as to claims Aviva asserts would subject it to liability for the

"equivalent of the premiums received for the Policies."[6] Aviva argues this was error

because interpleader is "'the proper forum for the determination of the various issues

interwoven through the claims' in contract on certain insurance contracts *and* adverse tort

claims seeking 'funds constituting the equivalent of the premium payments received by

[the insurer].'" Appellant's Op. Br. at 24 (quoting *Holcomb II*, 255 F.2d at 578-79).

Aviva's argument is unavailing for two reasons: (1) the Whites' remaining tort claims do

not assert an interest in the Policies; and (2) the Whites' remaining tort claims are not

adverse to the Millennium Plan's claim to the Policies.

---

[6] Aviva contends the *Holcomb* decisions stand for the proposition that interpleader is appropriate whenever a party seeks damages "equivalent" to the premiums paid on a policy under which another party claims benefits. As noted by the bankruptcy court, our decision in *Holcomb II* uses the phrase "funds constituting the equivalent of the premium payments received" only in reiterating Aetna's claims in its interpleader motion. 255 F.2d 577, 579 (10th Cir. 1958). The holding of *Holcomb II* is consistent with the requirements of interpleader we have identified: (1) a single, identifiable stake valued at $500 or more; and (2) two or more adverse claims to that stake.

-16-

**1.      The tort claims do not implicate a single, identifiable stake.**

The Whites' remaining tort claims do not assert an ownership interest in the interpleaded Policies or the premiums used to purchase those Policies. Aviva's argument to the contrary is a thinly-veiled attempt to cap its potential liability at the amount of the premium payments it received from the Millennium Plan for the Policies insuring the Whites. As the bankruptcy court recognized, the Whites' remaining tort claims seek general tort damages for Aviva's role in fraudulently inducing them to enter into the *Participation Agreements* with the Millennium Plan and are not limited by the value of or consideration paid for the *Policies* entered into between the Millennium Plan and Aviva.

For example, if the Whites are successful on their fraudulent inducement claim, they will have the right to recover any damages flowing from the Participation Agreements. These tort damages may include amounts the Whites paid in contributions to the Millennium Plan, the amount of any increased tax liability or penalties, and any other damages incurred in reliance on the fraudulent misrepresentations. And the Whites are free to collect any damages awarded on their remaining tort claims from Aviva's general funds.[7] Although the Whites' damages may, in part, be composed of their contributions to the Millennium Plan, nothing limits their total damages to the amount of

---

[7] *See Lee v. W. Coast Life Ins. Co.*, 688 F.3d 1004, 1014 (9th Cir. 2012) (holding that a claimant may seek to recover from a stakeholder's general funds "all damages directly and proximately caused" by a negligent stakeholder's actions).

those contributions or limits the source of recovery of their damages to the cash value of the Policies.[8]

In our *Holcomb* decisions, the Conversion Claimants identified a specific stake— the proceeds of the government bonds that had been paid as consideration for the policies—and asserted an ownership interest in it. Here, the Whites do not assert an interest in any specific property, and they have specifically renounced any claim to the Policies or the premiums paid by the Millennium Plan to Aviva. And unlike the Conversion Claimants in *Holcomb II*, the Whites' renunciation is not specious because the success of their tort claims will not "necessarily in contemplation of law negate" the Millennium Plan's ownership interest in the Polices. *See Holcomb I,* 228 F.2d at 81. Unlike the conversion claims in *Holcomb,* which targeted the proceeds from the bonds used to pay the policy premiums, the Whites' remaining tort claims do not implicate the interpleader asset.

Interpleader "may not be used by the stakeholder as a weapon to defeat recovery from funds other than the one before the court." *Great Am. Ins. Co. v. Bank of Bellevue*, 366 F.2d 289, 294 (8th Cir. 1966). The bankruptcy court therefore correctly denied interpleader relief with respect to those claims.

---

[8] The Whites may be required to offset any award of damages they receive from Aviva by the amount they received from the liquidation of the Millennium Plan's assets, depending on which of their claims are ultimately successful.

**2. The Tort Claims are not Adverse to the Millennium Plan's ownership of the Policies.**

Another reason why interpleader jurisdiction does not extend to the Whites' remaining tort claims is that they are not adverse to the Millennium Plan's claim to the Policies. As discussed, the Millennium Plan purchased the Policies from Aviva and is the sole owner of them. Accordingly, the Policies were an asset of the Millennium Plan's bankruptcy estate and Aviva properly paid the face value of the Policies to the bankruptcy trustee. Accordingly, we agree with Aviva that a claim seeking to rescind the Policies and to recover the premiums—of the type asserted in each of the *Holcomb* decisions—would be adverse to the Millennium Plan's claim. But the Whites' remaining tort claims do not seek to rescind the Policies, to recover the premiums the Millennium Plan paid for those Policies, or to recover any benefits under the Policies. In fact, the Whites assert no interest in the Policies or in the funds the Millennium Plan used to purchase them.

As the bankruptcy court found, the Millennium Plan's obligations to the participants under the Participation Agreements are distinct from Aviva's obligations to the Millennium Plan under the Policies. Thus, even if the Whites are successful on their claim that Aviva fraudulently induced them to enter into the Participation Agreements, it will not affect the Policies. Unlike the competing claims in *Holcomb I* and *Holcomb II,* the Whites' remaining tort claims are not mutually exclusive to the Millennium Plan's claim of ownership over the Policies because those claims do not challenge the validity of

the Policies. *See Holcomb I*, 228 F.2d at 81. Because the Whites' claims are not adverse to the Millennium Plan's claim to the value of the Policies, interpleader jurisdiction is not proper.

### III. CONCLUSION

In summary, interpleader relief does not permit Aviva to shield itself from its tort liability related to the separate Participation Agreements or to limit its total liability in tort to the value of the Polices. The key elements of interpleader—a single, identifiable asset and adverse claims to that asset—are not present in the Whites' remaining tort claims. We therefore hold the bankruptcy court and the district court, sitting in its capacity as a bankruptcy appellate court, correctly limited Aviva's interpleader remedy to allow the participants to pursue their state tort claims.

For the reasons stated above, we AFFIRM the decision of the district court.